IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

KATHERINE LOUISE CASSON,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. C15-4016

REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . 2

III.  PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.   Casson's Education and Employment Background . . . . . . . . . . . . 4
      B.   Casson's Medical History . . . . . . . . . . . . . . . . . . . . . . . . 5
      C.   Administrative Hearing Testimony . . . . . . . . . . . . . . . 10
           1.   Casson's Testimony . . . . . . . . . . . . . . . . . . . . . . 10
           2.   Medical Expert's Testimony . . . . . . . . . . . . . . . . 12
           3.   Vocational Expert's Testimony . . . . . . . . . . . . . . . 13

V.    CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . 15
      A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . 15
      B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . 17
           1.   Dr. Garred's Opinions . . . . . . . . . . . . . . . . . . . . 17
           2.   Credibility Determination . . . . . . . . . . . . . . . . . . 20
           3.   RFC Assessment . . . . . . . . . . . . . . . . . . . . . . . . 23

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII.  RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . 27

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 2) filed by Plaintiff Katherine Louise Casson on March 11, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Casson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Casson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 17, 2013, Casson applied for both disability insurance benefits and SSI benefits. In her applications, Casson alleged an inability to work since February 5, 2013 due to myasthenia gravis, blurry vision, muscle weakness, speech difficulties, fatigue, and chewing problems. Casson's applications were denied on July 30, 2013. On September 3, 2013, both applications were denied on reconsideration. On August 6, 2014, Casson appeared via video conference with her attorney before Administrative Law Judge ("ALJ") J. Doug Wolfe for an administrative hearing.[1] Casson, vocational expert Gail F. Leonhardt, and impartial medical expert Dr. Ronald DeVere, M.D., testified at the hearing. In a decision dated September 16, 2014, the ALJ denied Casson's claims. The ALJ determined that Casson was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a customer service representative or telephone solicitor. Casson appealed the ALJ's decision. On January 13, 2015, the Appeals Council denied Casson's request

---

[1] At the administrative hearing, Casson was represented by attorney Mario Davila. On the instant appeal, she is represented by attorneys Robert J. Engler and Eddy Pierre Pierre.

for review. Consequently, the ALJ's September 16, 2014 decision was adopted as the Commissioner's final decision.

On March 11, 2015, Casson filed this action for judicial review. The Commissioner filed an Answer on June 4, 2015. On July 6, 2015, Casson filed a brief arguing there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing her past relevant work. On August 7, 2015, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On August 18, 2015, Judge Mark W. Bennett referred this matter to a magistrate judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III. PRINCIPLES OF REVIEW

The Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). The Court has the authority to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id.* The Commissioner's final determination not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3).

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014). In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive

. . ." 42 U.S.C. § 405(g). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)

In *Culbertson v. Shalala*, the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

30 F.3d 934, 939 (8th Cir. 1994). In *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). *See also Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## IV. FACTS

### A. Casson's Education and Employment Background

Casson was born in 1956. She is a high school graduate. Following high school, she completed two years of college. In the past, Casson worked as a customer service representative, licensed practical nurse, telephone solicitor, and home attendant caregiver.

## B. Casson's Medical History

On February 5, 2013, Casson met with Dr. John Garred, Jr., M.D., complaining of blurring vision, associated with muscle aches, seeing floaters, and droopy eyelids. Upon examination, Dr. Garred found Casson had droopy eyelids bilaterally, and could not gaze upwards. Dr. Garred also found "progressive weakness" in her musculature. Dr. Garred diagnosed Casson with myasthenia gravis, droopy eyelid, neuropathy, depressive disorder, and anxiety disorder. Dr. Garred recommended medication as treatment.

On February 11, 2013, Casson met with Dr. James L. Case, M.D., for a neurological consultation regarding her diagnosis of myasthenia gravis. In reviewing Casson's medical history, Dr. Case noted that she developed double vision in March 2012, but her symptoms cleared up. However, beginning "several months" ago, she again experienced double vision, and more recently blurring vision. She reported a "global sensation" of fatigue, but no specific weaknesses or respiratory complaints. Upon examination, Dr. Case found "increased ptosis [(drooping eyelids)] with attempted upgaze. . . . There is moderate facial weakness. . . . There is no fatigable neck flexor or shoulder girdle weakness."[2] Dr. Case diagnosed Casson with elements of both ocular and bulbar myasthenia. Dr. Case recommended medication as treatment.

On July 11, 2013, Dr. Garred provided the Social Security Administration with a letter documenting Casson's diagnosis of myasthenia gravis. Dr. Garred noted that Casson was first diagnosed with myasthenia gravis in January 2013. Dr. Garred explained:

> [Casson] noted that she was starting to have diplopia [(double vision)] and gradually got bad enough that she couldn't focus on the computer. When she came in here, it looked like she had muscle weakness and fatigability which precipitated us

---

[2] Administrative Record at 411.

5

> getting a myasthenia panel and EMG studies. All these studies
> corroborate a diagnosis of myasthenia gravis.

(Administrative Record at 451.) Dr. Garred opined Casson would not be able to do "any lifting, carrying, standing, walking or sitting for any period of time. Climbing, kneeling and crawling are going to be difficult. Seeing is an issue as she has continued diplopia and also has trouble driving."[3] Dr. Garred concluded:

> The natural history of this disease process is that a third of people get better, a third of them will stay the same and a third will get worse. Obviously, she is at the present time not getting any worse, but she is not getting any better and is not going to be able to return to her computer job due to her vision problems and fatigability.

(Administrative Record at 452.)

On July 16, 2013, Casson had a follow-up appointment with Dr. Case. At the outset of the appointment, Casson reported no lid ptosis. She also had strong speech. She continued to complain of visual blurring aggravated by visual effort. Upon examination, Dr. Case found Casson "reads small print bilaterally with her glasses. . . . I note no ptosis or ophthalmoparesis with sustained upgaze and ocular tracking. . . . Normal neck flexor power. She is able to rise from a chair without use of her hands."[4] Dr. Case diagnosed Casson with ocular and bulbar myasthenia gravis, and continued her on medication for treatment.

On July 18, 2013, Casson met with Dr. Pariwat Thaisetthawatkul, M.D., regarding her diagnosis of myasthenia gravis. Dr. Thaisetthawatkul confirmed that Casson's diagnosis of myasthenia gravis is "probably correct." Her testing and symptoms fit myasthenia gravis. Dr. Thaisetthawatkul also noted that her symptoms were "well controlled" except for blurry vision. Dr. Thaisetthawatkul opined that Casson's onging

[3] *Id.* at 451.

[4] Administrative Record at 454.

problems with blurry vision and fatigue were not necessarily related to myasthenia gravis. Instead, Dr. Thaisetthawatkul suggested that her blurry vision may be a side effect of high doses of prednisone used to treat myasthenia gravis. Similarly, he opined that Casson's fatigability may be the result of obstructive sleep apnea. Dr. Thaisetthawatkul based his opinion on Casson's snoring and being obese. Dr. Thaisetthawatkul recommended that Casson continue her treatment for myasthenia gravis, and consult an opthamologist and sleep physician to treat her blurry vision and sleep apnea.

On July 30, 2013, Dr. Laura Griffith, D.O., reviewed Casson's medical records and provided Disability Determination Services with a residual functional capacity ("RFC") assessment for Casson.[5] Dr. Griffith determined that Casson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Casson could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations.

On September 16, 2013, Casson met with Dr. Beth Bruening, M.D., regarding her recent history of blurred vision. Upon examination, Dr. Bruening diagnosed Casson with nuclear sclerosis, nuclear cataract, and tear film insufficiency. Dr. Bruening concluded that Casson has a "history of myasthenia gravis and diplopia now greatly improved regarding her ptosis and diplopia on Mestinon and Cellcept and Prednisone but still having

---

[5] On August 30, 2013, Dr. Jan Hunter, D.O., reviewed Casson's medical records and considered Dr. Griffith's RFC assessment for Casson in determining her own RFC for Casson. *See* Administrative Record at 115-17. Dr. Hunter's RFC assessment is essentially identical to Dr. Griffith's RFC assessment, and Dr. Hunter concluded that "the initial assessment remains accurate and is hereby affirmed as written." *Id.* at 117.

complaints of vision difficulties."[6] Dr. Bruening believed that Casson's glasses were causing her vision problems and recommended that she see an optometrist for correction of the prescription in her glasses.

On September 18, 2013, Dr. Case provided Casson's attorney with a letter regarding his treatment of Casson. Dr. Case indicated that Casson was under his care for ocular myasthenia gravis. The disease results in "vision blurring and lid drooping to an extent that [Casson'] vision is frequently impaired."[7] Dr. Case concluded:

> Mrs. Casson works in a customer support job which involves keyboarding and use of a computer terminal. She is not able to perform this duty due to blurring of vision aggravated by visual effort.

(Administrative Record at 521.)

On October 30, 2013, Dr. Garred filled out a "Multiple Impairment Questionnaire" for Casson. Dr. Garred diagnosed Casson with myasthenia gravis. Dr. Garred found that at present, she was stable, but doubted that her health problems would improve. Dr. Garred noted that Casson "gets tired with physical activity" and the more she uses her eyes, the greater her vision is blurred.[8] Dr. Garred estimated Casson's pain level to be 0-1, but when fatigued, her pain level was estimated at 8-9. Dr. Garred opined that Casson could: (1) sit for 2 hours in an eight-hour workday; (2) stand/walk for 1 hour or less during and eight-hour workday; and (3) occasionally lift and/or carry a maximum of 5 pounds. Dr. Garred found that Casson had "marked" bilateral limitations in grasping, using her fingers for fine manipulations, and using her arms for reaching in all directions. Dr. Garred opined that Casson was incapable of even low stress jobs. According to

---

[6] Administrative Record at 537.

[7] *Id.* at 521.

[8] *Id.* at 522.

Dr. Garred, Casson would need to take 5-6 extra 15-minute unscheduled work breaks during an eight-hour workday. Dr. Garred determined that Casson should avoid wetness, fumes, temperature extremes, humidity, dust, and heights. Dr. Garred further determined that Casson should not push, pull, kneel, bend, or stoop.[9]

In a letter accompanying the questionnaire, Dr. Garred concluded:

> Prognosis of recovery is that this will probably either stay stable or may get worse as time goes on. I doubt there is going to be any significant improvement in [Casson's] condition at this present time. At this time, I do not feel that she can do full time competitive work and her disability will probably last longer than 12 months.

(Administrative Record at 531.)

On July 10, 2014, Casson met with Dr. Case for a follow-up appointment. At the appointment, Casson's primary concern was leg pain and weakness. Specifically, Casson reported "[s]he gets some low back pain, occasionally going into the right hip. When she stands she finds that she gets waves of weakness in the thighs and needs to sit down. She has not had frank leg buckling or falling but is concerned about the possibility of falls."[10] Upon examination, Dr. Case found no lid ptosis or diplopia. Dr. Case also found:

> Shoulder girdle strength is normal without fatigability. She is able to rise with a bit of difficulty from a chair without using her hands. . . . Knee jerks bilaterally symmetric. . . . Limb sensation normal over the foot. She complains of a bit of foot and ankle pain, but the ankle moves freely without warmth of deformity.

---

[9] On March 7, 2014, Dr. Garred provided a letter stating that the information provided in the October 2013 questionnaire remained "accurate." Dr. Garred also affirmed and repeated his findings regarding Casson's functional abilities. *See* Administrative Record at 589.

[10] Administrative Record at 718.

(Administrative Record at 719.)  Based on his examination, Dr. Case had the following impressions:

> 1.  Myasthenia gravis.  This has been primarily ocular and bulbar.  As before, her fatigue and complaints of legs giving out would raise the concern about transition to generalized myasthenia, although I doubt this to be the case.  I believe her myasthenia gravis appears to be doing well with the current regimen[.] . . .
> 2.  She does have blurred vision complaints.  Her exam looks benign to me, but note Dr. Bruening did document dry eye syndrome and mild cataracts. . . .
> 4.  Leg weakness.  The other concern would be a steroid myopathy.  I have discussed the option of EMG with [Casson], but she would rather hold off on this.

(Administrative Record at 719.)  Dr. Case recommended that Casson continue her current medication regimen as treatment.

### C.  Administrative Hearing Testimony

#### 1.  Casson's Testimony

At the administrative hearing, the ALJ asked Casson about her everyday symptoms:

> Q:  Can you tell me as far as physically on a day to day basis what symptoms you've been having[.] . . .
>
> A:  I just get [] fatigued very easily and I can just even get up during the day and just sit in my recliner and it will feel like I might have exercised a couple of hours, and I'm just completely wore out even though I didn't do anything.  And there have been times where I just needed to go back an lay down on the bed I'm just that tired, and sometimes I'd take, you know, fall asleep of course and rest but -- and you know just seeing, trying to see things, my vision gets blurry when I'm trying to read anything.  And if I try to concentrate on anything for very long it feels like my eyes are starting to, I don't know, jerk around in my head or maybe it's the muscles, I don't know what it is.  But it just feels like

they're twitching constantly and just trying to focus on
anything is impossible.

(Administrative Record at 46.)  The ALJ also questioned Casson about her functional

abilities.  She estimated she could stand for about 20 minutes before needing to sit or lie

down and rest.  She testified she could walk around a grocery store for about 30 minutes

before needing to return home and rest.  Casson indicated that she could only lift and carry

about 5 pounds because her arms constantly feel tired and weak.  Casson further testified

that she has difficulty bending, stooping, crouching, kneeling, and climbing stairs.

According to Casson, she regularly spends 1-2 hours per day lying down and resting, and

on bad days, she spends 3-4 hours lying down.  Finally, the ALJ inquired about Casson's

ability to perform household chores:

> Q:   And what do you do as far as household chores, you
> know, cooking, cleaning, doing the laundry?
> A:   Not much.
> Q:   But, you know, is your spouse doing those or are you
> able to help do those?
> A:   I try to make sure I get the dishes done because he's
> working all day, he's tired when he gets home.  So I
> just, you know, I try to make sure I get them done.
> And usually if I don't get them done the night before
> I'll get up first thing in the morning when I'm more
> rested I'll at least get that done.  And I don't vacuum
> on the same day I'm doing my dishes and I don't dust,
> I haven't dusted for quite a while matter of fact but --
> Q:   And so all those activities just exacerbate or make your
> -- levels go up and --
> A:   Yeah.  Tired.

(Administrative Record at 52.)

Casson's attorney also questioned Casson.  Casson's attorney noted Casson's

primary diagnosis was myasthenia gravis, a muscle disorder causing weakness and rapid

fatigue in muscles under voluntary control.  Casson's attorney asked Casson to describe

living with such a disease:

It's definitely been a life changer for me because I'm use to being a very independent person and worked since I was 13-years-old and it's difficult for me to have to sit home and do nothing pretty much. I'm just tired from the minute I get up in the morning, you know, pretty much, and if I've tried to do too much my muscles just get very fatigued and my arms just don't even feel like I'm going to be able to lift them.

(Administrative Record at 57-58.) Casson testified the disease also effects her vision, causing her eyes to twitch and have difficulty focusing.[11]

## 2. *Medical Expert's Testimony*

At the hearing, Dr. Ronald DeVere, M.D., provided medical expert testimony regarding Casson's medically determinable impairments. Dr. DeVere testified generally that:

Well first of all I'm going to make a couple of general comments because I do not believe that this lady has been thoroughly evaluated in her diagnosis because of her symptoms. She was diagnosed as having Ocular Bulbar Myasthenia, which is a disorder of the eye muscles and the face, but that doesn't guarantee that the extremities are involved. . . . They have not proven in this -- because first of all her neurological exams in her extremities by what she's saying have been normal. Every one of her doctors, including her neurologist, 17F, [provide] no evidence of any weakness or anything else, only some changes in the facial muscles, and maybe the eye. So that has not -- and they made an assumption that her disease is generalized, but you can't make an assumption. There's been no -- unless I don't have it, no EMG studies of her upper and lower limbs, because you can make a diagnosis of Myasthenia also in the extremity. And one and one doesn't equal two, because you have Bulbar

---

[11] There are two types of myasthenia gravis, ocular and bulbar myasthenia gravis and generalized myasthenia gravis. Ocular and bulbar myasthenia gravis only affects one's eye and face muscles. Generalized myasthenia gravis affects muscles all over an individual's body, including one's extremities.

Myasthenia that doesn't mean you have generalized. So at this point they haven't proven, particularly with normal exam, that she has generalized Myasthenia, that's number one. Number two, you could also tell with the -- if people have generalized Myasthenia you should be able to document specific weakness of the physic muscles on repetitive contracture. That's what this disease is all about, a fatigue -- but that's never been done on any of the exams that I've read, including five neurologists.

(Administrative Record at 62-63.) The ALJ also questioned Dr. DeVere about Casson's RFC assessment:

> Q:	Well let me ask your opinion, Doctor, given the state of the record as it is right now and in your opinion are there enough objective findings in the record to support, you know, her subjective complaints or allegations to the point that she would be limited to say less than a light range of work?
>
> A:	I'm giving you the benefit of the doubt and I'd recommend sedentary. . . .
>
> Q:	But if I found that she was limited say to sedentary work you feel like there's sufficient treatment history [] in there to hang my hat on to limit her to sedentary level of work?
>
> A:	Right now there's no evidence -- somebody could put her in light duty, I'm giving benefit of the doubt, give the least amount of work, sedentary[.] . . .

(Administrative Record at 67-68.)

### 3.	*Vocational Expert's Testimony*

At the hearing, the ALJ asked vocational expert Gail F. Leonhardt to "[a]ssume that the individual physically could perform any full range of light work, would that individual be able to perform any of [Casson's] past relevant work?"[12] The vocational expert replied "[y]es, the customer service representative would be classified as light and the telephone solicitor is sedentary, but I would, I would suppose if the individual could perform light

---

[12] Administrative Record at 72.

they could perform sedentary."[13] Next, the ALJ provided the vocational expert with the following hypothetical:

> if you assume that say the hypothetical individual could -- let's just limit it to sedentary, lift and carry 10 pounds. Could stand and/or walk combined two hours out of an eight-hour workday, sit for six hours out of an eight-hour workday, was unable to climb ladders, ropes or scaffolds. Up to one-third of an eight-hour workday could perform all other postural related work activities. And assume that because of the chronic nature of, of the fatigue and other symptoms that the individual was limited to performing the mental demands of unskilled work. Would that individual be able to perform any of Ms. Casson's past relevant work either as is generally performed or as she performed it?

(Administrative Record at 73.) The vocational expert testified that under such limitations, Casson could not perform her past relevant work, and would have no transferable skills for sedentary work.

Casson's attorney also questioned the vocational expert. Casson's attorney inquired:

> Q: If a person were to miss up to three days of work a week -- and this is based on [Casson']s testimony about fatigue. If they were to miss up to three days of work a month would that eliminate all the jobs?
> A: Yes, that would make them not sustainable, yes.
> Q: And this is also based on [Casson's] testimony. If a person were to be off task up to one-third of the day because they would have to lie down would that eliminate all jobs?
> A: Yes.
> Q: And going back to [the ALJ's] first hypothetical you mentioned that [Casson] would be able to do customer service rep job and telephone solicitor job. If I were to add to the hypothetical based on [Casson's] testimony

---

[13] Administrative Record at 72.

to be unable to read more than a sentence or two would
those jobs still be available?

A:    No.

Q:    Both of those jobs would be eliminated?

A:    Yes.

(Administrative Record at 74.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Casson is not disabled. In making this determination, the
ALJ was required to complete the five-step sequential test provided in the social security
regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert,*
482 U.S. 137, 140-42 (1987); *Moore v. Colvin,* 769 F.3d 987, 988 (8th Cir. 2014). The
five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether
> the claimant is severely impaired; (3) whether the impairment
> is or approximates an impairment listed in Appendix 1;
> (4) whether the claimant can perform past relevant work; and,
> if not, (5) whether the claimant can perform any other kind of
> work.

*Hill v. Colvin,* 753 F.3d 798, 800 (8th Cir. 2014); *see also* 20 C.F.R. §§ 404.1520(a)-
(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation
of disability, the process ends and the claimant is determined to be not disabled." *Pelkey
v. Barnhart,* 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful
> activity. If so, the claimant is not disabled. Second, the ALJ
> determines whether the claimant has a severe medical
> impairment that has lasted, or is expected to last, at least
> 12 months. Third, the ALJ considers the severity of the
> impairment, specifically whether it meets or equals one of the
> listed impairments. If the ALJ finds a severe impairment that
> meets the duration requirement, and meets or equals a listed

> impairment, then the claimant is disabled. However, the
> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant

"'bears the burden of demonstrating an inability to return to [his] or her past relevant

work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010). If the claimant meets this

burden, the burden shifts to the Commissioner at step five to demonstrate that "'the

claimant has the physical residual functional capacity to perform a significant number of

other jobs in the national economy that are consistent with [his or] her impairments and

vocational factors such as age, education, and work experience.'" *Phillips v. Astrue*, 671

F.3d 699, 702 (8th Cir. 2012). The RFC is the most an individual can do despite the

combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a),

416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the

responsibility for determining "'a claimant's RFC based on all the relevant evidence,

including the medical records, observations of treating physicians and others, and an

individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521,

527 (8th Cir. 2013); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Casson had not

engaged in substantial gainful activity since February 5, 2013. At the second step, the ALJ

concluded from the medical evidence that Casson had the following severe impairment:

myasthenia gravis. At the third step, the ALJ found that Casson did not have an

impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

At the fourth step, the ALJ determined Casson had "the residual functional capacity to

perform the full range of light work as defined in 20 C.F.R. [§§] 404.1567(b) and

416.967(b)."[14]  Also at the fourth step, the ALJ determined that Casson was capable of performing her past relevant work as a customer service representative and telephone solicitor. Therefore, the ALJ concluded that Casson was not disabled.

## B. Objections Raised By Claimant

Casson argues the ALJ erred in three respects. First, Casson argues the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Garred. Second, Casson argues the ALJ failed to properly evaluate her subjective allegations of disability. Lastly, Casson argues the ALJ's RFC assessment is flawed because it is not supported by substantial evidence.

### 1.  Dr. Garred's Opinions

Casson argues the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Garred. Specifically, Casson argues that the ALJ failed to properly weigh Dr. Garred's opinions. Casson also argues that the ALJ's reasons for discounting Dr. Garred's opinions are not supported by substantial evidence in the record. Casson concludes that this matter should be remanded for further consideration of Dr. Garred's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citation omitted). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if

---

[14] Administrative Record at 23.

it is inconsistent with other substantial evidence in the record). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); *see also Cline v. Colvin*, 771 F.3d 1098, 1105 (8th Cir. 2014) ("[L]ess weight may be given to the treating physician's opinion, but the ALJ must always 'give good reasons' for doing so. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting 20 C.F.R. § 404.1527(c)(2)).") . The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ thoroughly addressed the medical evidence of record.[15] In conclusion, the ALJ found that:

> The objective findings from [Casson's] treatment records and examinations do not fully support her allegations. The records consistently show response to treatment, the absence of frank symptoms of diplopia or lid drooping, evidence that her vision problems were related more to cataracts that were resolved with eyeglasses, and no evidence that she was suffering from any neurological problems in the extremities since all exams showed normal gait. (Exhibits 1F, 2F, 12F, 14F, 17F).

(Administrative Record at 29.) The ALJ specifically addressed Dr. Garred's opinions as follows:

---

[15] *See* Administrative Record at 24-30 (providing a thorough review and discussion of Casson's medical history and treatment for myasthenia gravis by her primary treating sources).

I am unable to credit the opinions in the medical source statements issued by her treating sources since they all indicate exertional limitations that are not consistent with the record as a whole and, therefore, those opinions are given little weight. (Exhibits 9F, 10F, 13F). It is noteworthy that the office notes by Dr. Garred often state the same findings on exam despite evidence of improvement on medications. The clinic note dated September 25, 2013 indicates she had full sustained upgaze with no lid ptosis or diplopia, her voice was strong, her neck flexor power was normal, deltoid power was normal, and she was able to rise normally from the chair. With regard to her fatigue, he suggested it might be associated with sleep apnea as the neuromuscular doctor had opined, but he noted she did not want to pursue testing for that possibility. (Exhibit 14F/27-29). The note dated January 27, 2014 shows that [Casson], on exam, had sustained upgaze that did not elicit complaints of diplopia, neck flexor power was normal without fatigability, and gait was normal (Exhibit 14F/30-31), but he gave opinions that her impairment would meet listing 11.12B based on muscle weakness in the extremities on repetitive activity and further indicated that she had marked limitations in using the bilateral upper extremities for grasping, turning, twisting, and reaching objects and performing fine manipulations; and she could not keep her neck in constant position.

I further find it noteworthy that the exam by the neuromuscular doctor on July 18, 2013 is in contrast to the progress notes by Dr. Garred. For instance, Dr. Garred noted on July 9, 2013 that [Casson] reported trouble with diplopia, tiring easily, urinary incontinence, dysphasia off and on, and neuropathy and muscle aches and pains. Exam was notable for droopy eyelids bilaterally, inability to gaze upward, and diplopia, and she continued to have weak lateral recti of the eye, peripheral nerve pain, and muscles tiring with repetitive movements. (Exhibit 8F/26). However, just a few days later when seen by the neuromuscular doctor, she did not have ptosis on looking up on the exam, no neck weakness, no facial weakness, and no limb weakness; her speech was clear and not

> slurred; and he opined that her ongoing problems were not
> likely related to the disease. (Exhibit 7F).

(Administrative Record at 30-31.)

Having reviewed the entire record, and considered the ALJ's discussion of the objective medical evidence and review of Casson's treatment history, the Court finds the ALJ properly considered and weighed the opinion evidence provided by Dr. Garred. Specifically, the ALJ determined that Dr. Garred's opinions were entitled to "little weight," and addressed inconsistencies between Dr. Garred's opinions and the record as a whole. Therefore, the Court concludes that the ALJ properly considered and applied the factors for evaluating a treating source opinion, and properly determined that Dr. Garred's opinions were entitled to only "little weight." *See Hamilton*, 518 F.3d at 609. The ALJ also thoroughly explained his reasons for granting Dr. Garred's opinions "little" weight. *See Cline*, 771 F.3d at 1105 ("[L]ess weight may be given to the treating physician's opinion, but the ALJ must always 'give good reasons' for doing so. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting 20 C.F.R. § 404.1527(c)(2))."). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. Credibility Determination

Casson argues the ALJ failed to properly evaluate her subjective allegations of pain and disability. Casson maintains the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues the ALJ properly considered Casson's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency,

20

and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman v. Astrue*, 596 F.3d 959, 968 ((8th Cir. 2010); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski* factors.'" *Renstrom*, 680 F.3d at 1066; *see also Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally

defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010).

In his decision, the ALJ thoroughly reviewed and discussed Casson's testimony from the administrative hearing.[16] In determining Casson's credibility, the ALJ addressed Casson's subjective allegations as follows:

> The objective findings from [Casson's] treatment records and examinations do not fully support her allegations. The records consistently show response to treatment, the absence of frank symptoms of diplopia or lid drooping, evidence that her vision problems were related more to cataracts that were resolved with eyeglasses, and no evidence that she was suffering from any neurological problems in the extremities since all exams showed normal gait. (Exhibits 1F, 2F, 12F, 14F, 17F). . . .
>
> [Casson] has described activities of daily living that are not as restricted as might be expected based on her report of disabling vision problems and fatigue. She reports the ability to drive a vehicle, prepare meals, and attend to personal needs.[17] The record shows good response to her medications with minimal side effects of diarrhea and nausea, but she acknowledged at the hearing that over-the-counter remedies help control the diarrhea.[18] There have been other recommendations for further testing to determine the cause of the fatigue that might be related to sleep apnea, but [Casson] has declined.

---

[16] *See* Administrative Record at 23-24 (providing thorough discussion of Casson's subjective allegations and testimony from the administrative hearing).

[17] *See also* Administrative Record at 23 (ALJ's review of Casson's functional ability statement from July 3, 2013, where she stated she could cook, attend to personal grooming, clean once per week, launder her clothes, drive a car, and grocery shop).

[18] *See* Administrative Record at 24-30 (providing thorough discussion of Casson's medical history, including her response to treatment).

(Administrative Record at 29-30.)

In his decision, the ALJ thoroughly considered and discussed Casson's treatment history, the objective medical evidence, her functional restrictions, activities of daily living, and use of medications in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Casson's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Casson's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *RFC Assessment*

Casson argues the ALJ's RFC assessment is flawed. Casson maintains that the ALJ's RFC assessment is not supported by substantial evidence. Specifically, Casson asserts the ALJ improperly discounted the opinions of the medical expert, Dr. DeVere, and the State agency non-examining medical doctors in making his RFC assessment for Casson. Thus, Casson concludes this matter should be remanded for a new RFC determination based on a fully and fairly developed record.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of

23

other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Here, in determining Casson's RFC, the ALJ addressed both the opinions of the State agency medical doctors, and the medical expert, Dr. DeVere. As to the State agency medical doctors, the ALJ determined:

> Based on the lack of objective findings of any deficits in [Casson's] extremities or any evidence she suffered from generalized myasthenia gravis, I am unable to credit the opinions of the State Agency medical consultants that [Casson] is limited to standing and/or walking for no more than 2 hours

and can only occasionally perform postural work activities and, thus, that portion of the opinions is given little weight. I am finding that she is capable of performing a full range of light work, which is consistent with the remainder of the medical source statements of the State Agency medical consultants, with that portion of the opinion given great weight.

(Administrative Record at 30.) Similarly, the ALJ addressed the medical expert's opinion and determined that:

based on the totality of his testimony, I am unable to credit the medical expert's testimony that [Casson] is limited to a sedentary level of work since he testified that there is no objective basis for finding [she] has any functional limitations and, thus, the opinion is given little weight.

(Administrative Record at 31.) The ALJ further explained his RFC determination as follows:

The objective findings from [Casson's] treatment records and examinations do not fully support her allegations. The records consistently show response to treatment, the absence of frank symptoms of diplopia or lid drooping, evidence that her vision problems were related more to cataracts that were resolved with eyeglasses, and no evidence that she was suffering from any neurological problems in the extremities since all exams showed normal gait. (Exhibits 1F, 2F, 12F, 14F, 17F). The medical expert testified that all of her neurological exams were normal, that the record does not support a diagnosis of generalized myasthenia gravis [], and that her complaints of diarrhea and blurred vision were most likely caused by the medications she was prescribed.

(Administrative Record at 29.) Finally, in determining Casson's RFC, the ALJ thoroughly addressed and considered Casson medical history, treatment of her complaints, and the

objective medical evidence.[19] The ALJ also properly considered and thoroughly discussed Casson's subjective allegations of disability in making his overall disability determination, including determining Casson's RFC.[20]

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Casson's medical records, observations of treating and non-treating physicians, and Casson's own description of her limitations in making the ALJ's RFC assessment for Casson.[21] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Casson's assertion that the ALJ's RFC assessment is flawed is without merit.

## VI. CONCLUSION

I find that the ALJ properly considered and weighed the opinions of Dr. Garred, properly determined Casson's credibility with regard to her subjective complaints of pain and disability, and properly determined Casson's RFC based on a fully and fairly developed record. Accordingly, I believe the ALJ's decision is supported by substantial evidence and should be affirmed.

---

[19] *See* Administrative Record at 24-31 (providing a thorough discussion of Casson's overall medical history and treatment).

[20] Administrative Record at 23-24, 29-30 (providing a thorough discussion of Casson's subjective allegations of disability).

[21] Administrative Record at 23-31 (providing a thorough discussion of the relevant evidence for making a proper RFC determination).

## VII.  RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and enter judgment against Casson and in favor of the Commissioner.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this _10th_ day of December, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA